The next case will be argued together. CCSF v. USCIS, State of California v. U.S.D.H.S., Washington v. U.S.D.H.S. I think we will set it up so that government goes first for 45 minutes. That may or may not be the time that you need, but the 45 minutes may include your rebuttal. And then we will have arguments from each of the three plus an amicus. So, all yours. Thank you, Your Honor. May it please the court, Jerry Sinsbeck, appearing on behalf of the government. I'd like to reserve five minutes of time for rebuttal. Okay. Then you can take it off. Yes, I can. Thank you. The district court's injunctions in these cases should be set aside. As a panel of this court has held, as well as the Supreme Court, the plaintiffs are not likely to prevail in this litigation. As a threshold matter... The Supreme Court has still held? What's the Supreme Court held? Well, it granted the government a stay in the Second Circuit and Second Circuit cases with respect to injunctions identical to this. So, it necessarily concluded in granting the stay. Did it say so, or did it just grant the stay? It just granted the stay. So, it hasn't expressed that it said so. We know that the Supreme Court's been granting stays in cases like this with some frequency and with very little explanation. So, you may be right as a logical matter to draw this inference, but I'm not sure that that's truly the case. The Supreme Court seems to be quite quick to grant these stays. Your Honor, all I can say is I'm sure Your Honor is aware that the standard for granting a stay is that the government has to show it's likely to prevail on the merits and so forth. But even... So, putting those issues aside, plaintiffs are nonetheless on the merits. Can I ask you a question about that, counsel? So, you know, we have this kind of strange standard in Ninth Circuit where we can kind of... The likelihood to prevail on the merits can kind of be down a little bit if you've got enough on the other factors. Are you aware if the Supreme Court has that standard, or I think the Supreme Court is just likely to have to... be likely to prevail on the merits. You know, the only Supreme Court precedent is... Each of the elements have to be... So, Judge Fletcher, I just cut out for about, you know, right when he started talking, everything cut out. Can I get him to repeat that? I apologize. Yeah, I lost it as well. So, please go forward again. I'm sorry. I'm not familiar with any Supreme Court case applying a sliding scale type approach. Obviously, as Your Honor is probably aware of, the Winter case is generally the primary one with preliminary injunctions. In that case, the Supreme Court stated that each of the elements had to be met and suggested, at least, that a sliding scale was inappropriate. But I'm not familiar with that in a particular context. Now, turning to this case, we think at the threshold plaintiff's claims fail because they lack standing to pursue them. I think most notably, they seek to further an interest, greater use of public benefits, federal public benefits by aliens that is diametrically opposed to the interest to be protected by the public charge statute. Plaintiff's claims also fail on the merits. The DHS here adopted a definition of public charge in which it provided that an individual who is expected to use one of three means-tested benefits, going to basic necessities, food, health care, and housing, and is expected to use those for a prolonged period, that that person is likely to be a public charge. That definition is consistent with the text of the INA. It's also consistent with surrounding provisions that were enacted in 1996. And it's consistent with congressional intent. When you say long period, how long are we talking about? There's an aggregate of 12, as I understand it, but each separate payment counts as one. So if, for example, I'm getting payment from three sources over the same month, the long period is four months. Is that right? Am I understanding this correctly? That's correct, Your Honor. But then I would just point out, at that point, if an individual is relying on Medicaid for health care, housing, and SNAP for food, then that person looks a lot like the person who's primarily dependent on government for their basic needs. It looks a lot like the person that plaintiffs are saying is covered by the public charge provision. And contrary to plaintiffs' arguments, the public charge provision hasn't had a long-standing, unambiguous meaning that Congress implicitly adopted. In fact, all the evidence is to the contrary. Congress has never defined the term, and not only that, just prior to the INA, Congress reviewed the immigration laws dating before the INA, and concluded that the term had been given in different meetings, in various meetings, and that, quote, you know, there should be no effort to define the term in law, and that instead it should be left to the discretion of the executive branch. And we see that in the INA itself when Congress stated that the decision was to be made in the opinion of the Secretary of Homeland Security now, at the time the Attorney General. And also setting forth factors that are to be considered at a minimum, but I think making clear that the executive branch has the discretion to define the term and to apply it. And as I said, Congress has never defined the term. Well, there are limits to its discretion. And the Seventh Circuit seemed to agree at least to some extent that there is no fixed meaning, but that the definition that you have chosen is simply beyond the pale. So what is your response to that? Thank you, Your Honor. Yes, we disagree with that, of course. We think, the Seventh Circuit seemed to think that there was, you know, that the government's definition had no limit. That's not true. As the agency made clear, the limit here is self-sufficiency and self-reliance, and whether an individual can be deemed, you know, not to rely on government benefits and not be self-reliant. And I think it depends on the nature of the benefits and the length of time that the agency is considering. And here the agency is not considering the world of benefits and narrowed it down to just three benefits, going to basic, or three non-tax benefits, going to basic necessities, and it even excluded people who were expected to use them on a temporary or intermittent basis. By requiring at least 12 months' worth of usage or... ...months would qualify, but rather whether this particular rule... This is not your fault. I was... You cut out again. I'm not sure whether the other guys... About 20 seconds ago, counsel, you cut out for all of us. I'm sorry. I didn't mean it like that. No, it's not your fault. No, it's not your fault. It's doing it to all of us. Yeah, so I just, you know, the main point I'd like to make, and I think one way that the Seventh Circuit erred, is in kind of, you know, evaluating hypothetical rules about where the government was, you know, finding someone to be in public charge for one month of benefits or so forth. That's not the rule before... That wasn't the rule before the court, and that's not the rule the government is defending here. Instead, it's one in which, you know, we think it's reasonable to say someone who's relying on, you know, one of these three means-tested benefits going to basic necessities for at least 12 months at a 36-month period, or more than 12 months at a 36-month period, is a public charge. And that's the only question before the court. So... Counsel, I've got... Something that kind of occurs to me in reading through all this, you know, the old rule is the... It's not a real rule. It's the 1999 guidelines, which they tried to make a rule, but didn't... The standard was supposedly this primary dependence standard, but the main way that you supposedly implemented the primary dependence was if people were relying on cash benefits, not the non-cash benefits. It's a new rule. But as you mentioned earlier, it's odd to me that that rule seems a little bit disconnected, or I should say the guideline seems a little bit disconnected from the rationale in that you can easily, I think as you noted earlier, you can easily be, quote-unquote, primarily dependent upon government benefits and not be receiving any cash benefits, right? If you're receiving housing, Medicaid and food stamps, you're pretty dependent on government benefits, I would say. All of your basic necessities are being... And yet you would, under the old rule... So that's... Plaintiffs here are really fighting for the old rule, but the old rule doesn't seem to actually be very rational. Well, Your Honor, we agree that the old rule, in fact, that was one of the main drivers of the agency's decision to change the rule was that it was arbitrary to exclude these non-cash benefits, which are often of greater value in terms of government expenditures, at least, and greater value, I think, to individuals or as great value to individuals as cash benefits are. And so you're right. That was a reason why... That was an express explanation the agency gave in the rule for changing and starting to incorporate these benefits that the old rule had been too permissive and irrationally distinguished between cash and non-cash benefits. I do also... I think, you know, at one point, plaintiffs obviously emphasized quite a bit, and this has come up in other arguments about the idea that, you know, a rule could apply to someone who's receiving a de minimis amount of benefits over time. And I want to be clear that it's important to think of how the definition of public charge interacts with the framework and the factors that are also part of the rule and also how it will work in practice. Obviously, the public charge determination is forward-looking, and you have to make a prediction, you know, and according to the statute, at any time, so for the rest of the person's life, about their income and the likelihood they'll be on benefits and so forth. And no one in the rule... In the examples provided in the rule reflect this. No one expects an adjudicator to be able to say with precision, you know, this particular person is going to have this income for each month of their life or they're going to use Medicaid in these months and so forth. I think what the factors are designed to do is to say, look, if we look at this person's income and their skills and their... whether they have the support from a sponsor and what their age and health is like, is this a person that is going to use benefits just temporarily or sporadically in which... or not at all in which case this person isn't likely to be a public charge or is this person someone who's going to be relying on these basic needs, basic benefits for extended periods of time? And that's what the rule is getting at. So, you know, this idea that it's hard to imagine how someone who's only using a de minimis... expected to use a de minimis amount of benefits, how an adjudicator actually could rationally make that decision, what factors that person would be relying on to say, I expect this person to be employed and to be making more than the poverty line and not to have private health insurance and so forth but to be using some small amount of SNAP benefits, for example. That's just... that type of person isn't going to be captured and reacted as a rule. So you would concede that if a rule said that if you're... on public... if you are in public housing and you use six months' worth of SNAP benefits that that would be invalid? No, no, Your Honor. I mean, that is... that is a rule and that is the definition of... I mean, it would have to be more than six months because it has to be more than 12 months but yes, I mean, that is the definition. My point only is that... Well, six months in public housing plus receiving benefits looks well there. Yes, exactly. But what I'm suggesting is that a person... Six months. It would be six months, yes. Yes. So you... I'm sorry, so I used six. That was probably... I gave two, so it's within... Right. So that you would concede if it were two months that there were a rule that said, okay, two months of public benefits in your public charge, that would be invalid? Well, again, I think the test is whether, you know, the suggestion that someone's using two months of benefits, does that indicate that they're not self-reliant which is the ultimate touchstone of the public charge and I think it would... You know, certainly the agency under its current rule hasn't suggested it would be said that at least 12 months or at least... Well, you know... Two benefits and so forth. In the situation we're in now with people lining up for food, almost everybody can be... There are millions of people who might be public charges under this concept, aren't there? Well, for one thing, Your Honor, the rule itself excludes many programs, at least all state and local non-cash benefits, so state and local programs would not be included in those types of benefits and it also excludes various forms of Medicaid including emergency Medicaid, so I'm not sure how many people actually would be considered public charges but I think, moreover, you know, the public charge term itself obviously applies only to aliens. It's not one that applies to US citizens and, you know, aliens are subject to all sorts of rules that US citizens aren't including, you know, they have to obtain sponsors, they have to agree to repay any benefits they receive, they can be removed from the country in certain circumstances if they don't repay those benefits, so it's really, you know, obviously Congress had an interest and it said so expressly in its policy statements of excluding individuals or of not, or wanting the government not to admit individuals who rely on the government for their needs and to not have public benefits serve as an incentive to immigration. So counsel, to Judge Schroeder's question here, I'm a little confused in the record as to sort of where we stand with, so like you said earlier, the Supreme Court, there was some, you know, our court stayed the injunction, other courts did not, I think the Fourth Circuit actually either stayed the injunction or maybe on the merits, I think the Fourth Circuit ruled on the merits, right, and overturned the preliminary injunction on the merits. Am I right on that? Yes, they stayed it first and then overturned it on the merits. Okay, and then, but something happened to where, so the states were all either gone because of the Supreme Court or our court or the Fourth Circuit, but then something happened and because of the COVID situation, you didn't contest it or what, I don't quite understand what happened there. Sure you are. So let me just, to clarify, and it is a little confusing, but in February, the Supreme Court had stayed the Seventh Circuit and the Second Circuit injunctions and this court had stayed the Ninth Circuit injunctions and the Fourth Circuit had stayed the Fourth Circuit injunction. So in February, the rule went into effect last week of February, I think it was. It was then in effect until the last week of July, I believe, around that time. At that point, the district court in the Southern District of New York entered a second injunction. This is the same court that had issued one before that the Supreme Court had stayed. Stayed, exactly. Saying that because of the COVID pandemic, that necessitated a second, kind of, essentially overlapping injunction at least during the COVID crisis. The Second Circuit immediately stayed and that was also nationwide. The Second Circuit pretty much immediately stayed that injunction on a nationwide basis, limited it to just the Second Circuit. Then just on Friday, I believe, or Thursday, the Second Circuit actually stayed the whole thing. Basically, on the grounds that the district court didn't have jurisdiction to issue a new injunction when the old injunction was on appeal. And so, as of, you know, today, essentially yesterday, the rule is back into effect nationwide. And is the government applying the rule? Because I thought I saw on the website or something, that's what I'd seen about this. Yes, so the government was applying the rule from February 24th until July 29th and then set out its website because it was subject to a nationwide injunction. We're not going to apply it. But now we're back. I don't know if the website has been changed today or, but it will be in the very near future, I'm sure. Let me understand a little bit the operation, the practical operation of the rule. I gather if somebody's in LPR leaves the country and then seeks to come back in, if he or she has received benefits in the excess of 12 months, as defined by the rule, he's no longer admissible. I understand that if someone is in the country and has received benefits, the person is subject to removal. What about people coming to the country for the first time? What does the government do? Does it look at the person and predict? Or does it let the person in and then wait to see what happens? So in all cases, it's predictive. Now, if you're making a prediction about the future, whether they will in the future. It's not in all cases because I gather what happens when LPR has left and seeks to come back in, the evidence of having received benefits is used against them. That's not predictive at all. So, Your Honor, I agree with you that the use of past benefits will be a strong factor in showing that in the future they're likely to use it. It's a heavily weighted factor, but it's not a dispositive factor. And I'd also point out that just for LPRs, it only applies to them coming back to the country if they've been gone for 180 days or more and effectively given up their LPR status. What I'm really interested in is what about someone coming to this country for the first time has definitely a no record and therefore no presumption? Right. So they would have no... You look at their education level, their age, their health condition... I'm sorry. I just lost you again. No fault of yours. It cut out again. Sorry. So you were about to answer me. What do you do about the person coming... Okay. Yeah. So obviously you're not relying on past usage at all, but you do look at and they fill out a long form to this effect. You look at their education, their age, their health conditions, their, you know, skills, whether they have a sponsor. You look at all of these factors and use that to predict whether in the future they will rely on public benefits. So if it's a, you know, if it's someone who's young, who's... And this is an example given in the rule itself. If the person's young, if they have, you know, they're in college, say, they don't have dependents, they're healthy, this is someone who's not likely to be found to be a public charge. On the other hand, if it's an older person, you know, maybe they don't have a good employment history, you know, they have a health condition, you know, that's going to weigh, that's going to, you know, weigh against them and make them more likely to be found. Council, am I correct that some of these benefits, they wouldn't become eligible for five years? So that if they're entering, there would have to be a prediction as to whether or not in five years they would be on some of these benefits for a 12-month period? Yes, Your Honor, that's exactly right. It is for most, and the people who are primarily affected by this rule are people entering for the first time, but more importantly, people who are in the country who are applying to become, to get their green card, to become LPRs, and for those people, they wouldn't have been eligible for benefits previously, for most people. Now, refugees and asylees might be, but they're not subject to the public charge rule. So for the most part, past benefits usage won't be a factor that comes up very often in making these determinations because people won't have been eligible. It will be predictions based on their, again, education, their skills, their sponsors, and so forth. And these are long-range predictions. Yes, but the statute itself, of course, said will someone at any time be a public charge? And that kind of gets, again, to my point is, no one expects these determinations to be made with mathematical precision in terms of income and so forth. It's really getting at, are these individuals who, because of their various characteristics, are likely to be using these benefits for prolonged periods, or are they just people who might use them temporarily or not at all? And so the rule is trying to distinguish between people who are regular users of these benefits and people who are... Regular users, long periods of time, but the rule is that operates can cut somebody off far short of 12 months. I don't think long is the appropriate adjective. Well, yes. I mean, either, I guess I could say either long, if you consider 12 months. I mean, obviously, you can disagree with whether 12 months is long, but then, or, you know, or, I don't know, long or, I forget the definition. I'm just kidding. We just went through the exercise where if they're getting two kinds of benefits for six months, they're public charged. Yes. That's correct. But, again, that's someone who is relying on the government for health care and housing or food and housing for a six-month period, which, you know, the question is, is that reasonable to say that person over a three-year period, so not six months the rest of their life? But, you know, is that, is that, is it reasonable to say that person is not self-reliant? And it sounds so, can we, can I, I want to ask you, I want to hear about, from you, about the arbitrary and capricious argument, but before you get to that, congressional, I want to hear about congressional actions, but before you get to that, the affidavit requirement. So, you mentioned earlier when somebody's coming in, you know, if you're coming in under the family, the biggest category, you have to have an affidavit, essentially, and this affidavit, if you have the affidavit from somebody, does the rule affect you because you have the affidavit somebody's promising to pay back anything, any charges you might possibly have? So, does the rule even affect you to have the affidavit? I'm a little confused on that. Sure. So, the affidavit is considered a positive factor, and obviously, Well, if you don't have the affidavit, you're dead in the water, aren't you? Right. So, if you don't have the affidavit, you're out. It can be the person who's offering the affidavit can themselves be Counselor, you froze up again for us. I'm sorry. It's just, when you said you don't have the affidavit, you're out, and then I didn't hear anything after that. So, yeah, so, if you do have the affidavit, that will weigh in your favor, but it's possible that you could still be considered likely to be a public charge, because, first of all, the affidavits only last for 10 years, and public charge goes beyond that. But then, secondly, you know, the sponsor could themselves be, you know, just barely over  and you might question whether that person over the long term will be able to pay back benefits and so forth. So, it will weigh in your favor, but it doesn't mean that you're automatically not a public charge. Not dispositive. Okay. Not dispositive. That's correct. So, what about this congressional acquiescence that Congress made very clear that primarily dependent is all they want, notwithstanding passing the affidavit? Well, I don't, you know, I, yeah, so, in terms of acquiescence, you know, Congress has never defined the term, obviously, and they also haven't, am I aware, ever said that they thought it was primarily dependent or anything of that nature? Defined in law and then enacted the INA? No, we lost you again. Again, not your fault. You, we lost you when you were saying Congress has never said. So, as far as I know, in the long legislative history of the various enactments, Congress has never, you know, indicated that it thought there was any fixed definition, let alone the primarily dependent definition. And, in fact, you know, in the INA, it specifically granted discretion to the, to the government and also said in the legislative history that it was aware there were different varying, varying definitions. I think I've lost, I've lost Judge Fletcher on my display. Yeah, you might hold off for a second. Can, Sam or somebody, can somebody stop the clock real quick while we wait for Judge Fletcher to get back? Yes, Judge, and we, we apologize for the interruptions. I'm trying to figure out the, the cause, but it looks like it's, it's a building network issue on a, on a higher level than, than I can control. I thought you narrowed it down to Judge Fletcher and so you cut him out. No, this seems to be happening across the board here. So we're, we're doing our best to work through it. Oh, so here we go again. When, when did, when's the last time we cut you off, said Jerry? I think we were talking about the congressional acquiescence. Yeah, that's my recollection. Okay. So, you know, the point I make that, you know, this would be a, kind of a novel application of that, of that can of statutory construction, given that, you know, Congress itself has never expressed an indication that it thought there was a set of definition. In fact, it had in the past recognized that there were different definitions and standards used. Also, you know, there's obviously no Supreme court case or courts of appeals cases or, you know, that settled or even stated the definition that, that plaintiffs are promoting. So I really, it is, it would be kind of a, quite a leap to conclude contrary to the evidence. And we know, even if we look at the statute itself, that Congress has made clear that the decision is to be made in the opinion of the, of the secretary of Homeland Security, that, that, you know, Congress has, you know, formally concluded throughout, throughout the history of the statute that there should be discretion with the executive branch to define the term. Is there some other boundary to this term public charge we've had a question like this before, but I'd like to pursue it again. So what if the rule is, the new rule is not exactly the rule we have, but any public benefit at any time, is that in violation of the statute? So your honor, I mean, I suspect it would be, I mean, obviously you'd have to look at that rule. I think again, the touchstone is self-reliance. So for example, if you one were to say that the use of public schools or the use of a fire department or snow removal, it's likely to make someone a public charge. I don't think one could justify, justifiably say that a person who uses those benefits is not self-reliant as they're available to the general public. I'm talking about any one of the benefits that are listed here, you receive one of those benefits for one month. Is that consistent with the statute that that's a person who's a public charge without using a statute? So I, you know, it wouldn't be under the rationale that the agency has provided for this, for this rule, because the idea being that a person who uses it temporarily is not self-reliant. The agency would have to therefore come up with a new rationale to explain why a person who's using a benefit for one month is not, you know, considered self-reliant. And that would be quite a break from, from past practice and quite a break from, from how the term has been interpreted. So I, I see, quite a break from past practice. Are you then agreeing that acquiescence is one, one of the ways we can look at this case? No, I guess what I was suggesting is they would have to come up with an explanation for why, you know, that person is, could be considered a reluctant... Okay. Well, isn't there, the, the Second Circuit didn't agree with you that there is, I, I don't think that, because it, it, it felt that there was a kind of a common understanding of what a public charge means, which means that, that you're primarily relying on the government for meeting basic needs on a, you know, more or less kind of permanent basis. And the Second Circuit didn't agree with you that there's no, that there, there is no fixed meaning and that the government just has discretion to take almost anything it wants. So, where did the Second Circuit go wrong? Yes, Your Honor. Well, we disagree that, that has this unambiguous meaning to its being primarily dependent on, on government benefits or to be excluded there. If you look into... It's not an ambiguous meaning. It's a kind of a core meaning. It goes back culturally. We've had, what you call potter's fields where people did not have enough money. They were, they were, they were not self-sufficient. So they get buried in potter's fields. That included Mozart. But, I, I, there is a kind of a cultural notion of what a public charge is. Is there not? Your Honor, I don't know about the cultural notion, but in the case law that we see, even getting back to the 1800s, we don't see this narrow, primarily dependent on it. We point out a couple of cases in our brief. For example, the Turner case where someone who was hospitalized for two weeks, that was considered sufficient. We see, you know, I think the fourth circuit cited an 1896 report to the treasury secretary saying, you know, a number of people were, fell into temporary distress and were therefore public charges. And we see in the, the matter of B case from the 1940s, just prior to the INA, where the BIA saying, if someone uses clothing or transportation that, and other incidentals that are provided by the government that can qualify as someone to be a public charge. So there really hasn't been, and we know that Congress has specifically said, you know, the executive branch should have discretion to apply the term and interpret it to reflect, you know, the ongoing development in, in public benefits and how they are provided and so forth. And here, I think the second circuit went wrong and that we are not talking about, you know, some de minimis amount of benefits, you know, the agency or any benefit at all. We're talking about three means tested benefits that are provided for basic necessities and that go to the generally the neediest individuals in the country. And it's, and the question only is whether that's a reasonable interpretation of someone who's not self-reliant, someone who can be expected to rely on those types of basic benefits for either, you know, an intense period or, or an extended one. Arbitrary capricious. Yes. I think you just, I think you muted yourself counsel or somebody did. Yeah, I hit the keyboard. I think, so the, you know, the district court here concluded that the agency acted arbitrarily and capriciously in failing to consider the various costs of the rule and also the public health effects of the rule. I think, you know, the motions panel addressed those points at length and we agree with its assessment. The agency, in fact, you know, acknowledged that it was departing from the 1999 guidance provided its reasons for why it was doing so. It also acknowledged the various costs that might, might occur to local governments. And then there might be disenrollment in state governments. And it took steps to mitigate those costs by excluding certain benefits from the rules covers, including Medicaid for pregnant women and Medicaid for kids or for people under 21. And it also, you know, ultimately though concluded that the benefit of more closely aligning the rule to congressional intent and removing the arbitrary distinctions between cash benefits and non-cash benefits, you know, over, you know, over justified any potential costs that might, that might occur. And that's all the APA requires is that kind of detailed, that level of details of analysis. And it certainly, you know, 400 or 500 pages of, of the rule, you know, explored the different comments and the different, you know, arguments against the rule in, in address those. And that's all that was required. Are you still, I think you're locked up. I'm sorry. Okay. I think you're opposing. Counsel's going to say, yeah, we agree. They looked at that stuff and they did take the,         we have a, we have a, we have a, we have a, we have a, we have a, we have a, we have a, we have. We have experts. Or, you know, there's a really bad things are going to happen in the comments. And I think their argument has to be the life. Since these really bad things were happening. I think that's the argument that they're left with. And I, it seems like. I mean, do you acknowledge that? Like, if something really, really bad, what's going to happen? And we knew it was going to happen, that something could fail. Arbitrary. Capricious review. For that reason. Otherwise have such high costs. I think it would be arbitrary and capricious for the government to do it. Well, I guess in your arm or something, I'd have to know what the corresponding benefits. Right. That's a difficulty here. It seems like, because let's say there was a really high cost. The benefit is, is. Let's say we agree with you that Congress. Wants them to keep out quote unquote, public charges and public charges for people that are not self-sufficient. Let's say we agree with you on all that, but we said the government is doing it in a way that has too high. Just too high of a cost. No, I don't know. I mean, as the motions pointed out, the fact that that rule will have imposed costs on individuals, including, you know, I mean, I forget the name of the case, but they said a Medicaid case, just because there are costs imposed. I'm not aware of a case, at least in a case where there isn't a specific cost benefit analysis that's required. That just, just saying the costs are high. Well, not to find it. The problem here seems to me, one problem seems to be that. That what was, what has been pointed out is that this is going to backfire. Then this is going to have an adverse effect on people and harm the public health. And that that was not just wasn't taken into account. And. I don't quite understand what the, what the response to that is. I understand that the opinion on the stay order. Seem to discount that, but that was done before we had any briefing. So I, I just, I don't, I don't really see a response that, that is pointed out that this has been a backfire. And they have standing to, to raise those issues. Why, how this has been taken into account. I think it was taken into account a couple of ways. Obviously I mentioned certain public health effects. I think in particular, there was a lot of concern about vaccination rates. And that eventually leading to higher. Heartful effects on health. When in fact, you know, so the agency responded by excluding Medicaid for children under 21 and pregnant women and making clear that, you know, state and local benefits aren't covered. So, so that to address that issue. And I think it felt that, you know, I couldn't obviously estimate exactly how many vaccinations might, might nonetheless fall through the cracks that that would substantially address it. I think more generally, for example, if we end up getting a vaccine for COVID. And I've got an adult alien. The only way he or she can get that is to go on a Medicaid. That person's between a rock and a hard spot, right? You get the vaccine or you. Oh, you're out of luck on immigration status. All right. No, for a couple of reasons, your honor. One, I think it's, you know, specific to the situation, actually the agency issued guidance saying that any, any Medicaid usage for the purposes of a COVID vaccine or treatment, wouldn't be covered or wouldn't be considered. So that was as kind of a one-off. I'm sorry. What do you say that's now in the rule? It was issued as guidance interpreting the rule. You know, the rule itself hasn't been reissued, but it is guidance that the agency can sit down by and it's published. What about non-nurse children? Because of the SNAP, because of the absence of SNAP benefits. Right. So I think this goes to that kind of my second broader point, and I just, I don't want to skip around just to answer judge Fletcher's question for one additional month. All of these. Well, it's true that if you use Medicaid to get a vaccine, assuming you're eligible for Medicaid, which most people who are subject to the public charge rule are not eligible for Medicaid at the time they're applying. But if you could say, look, I needed this vaccine one time for COVID, but I'm not going to be on Medicaid afterwards. That's something that could be taken into account by the adjudicator. It's a totality of the circumstances test. But then I get to get to judge Schroeder's question. If, you know, the agency pointed out, and it is true that individuals who are subject to the public charge rule are not eligible for SNAP benefits at the time they're applying because they haven't received their green cards yet or they're, you know, seeking to be admitted into the country. So yes, there are people who are expected to disenroll because they're confused about the rules coverage. They think they're covered, but if they already have their green card, they're not going to be subject unless they leave the country for 180 days. And so there's no reason for those people to disenroll. And one thing the agency was hopeful is that through, you know, partners and for guidance that people would come to understand that they had no basis for disenrolling in these benefits, because if they are eligible for the benefits, chances are there's a very high chance that they are not subject to the public charge rule. So there was a notion that these individuals would be re-enrolling once they understood that, that they had been mistaken about the coverage, which also, you know,  Potential impacts of the rule. If your honors have no further questions, I'm happy to. What's your adversary? Yeah. So what are you reserved? We've got about six minutes. Great. No, I think the first, first person going forward is proceeding. County San Francisco. Is that correct? Thank you. That's right. Your honor, Luke Edwards for the county of Santa Clara and the city and county of San Francisco. I'll be addressing how the public charge rule runs. Contrary to the INA. My colleague, Ms. Rich will be addressing the plaintiff's arbitrary and capricious arguments. And our colleague, Ms. Heinz will be addressing standing the remaining preliminary injunction factors. Thank you. The department of Homeland security, public charge rule disregard statute to wrongfully convert what historically was a narrow ground of exclusion into a dramatic restriction on immigration. As the county contended pages, 23 to 26 of their briefing, the Chevron framework isn't applicable here. And DHS is owed no deference because it lacks authority to decide questions of law within the INA. Regardless of whether the Chevron framework is applied, DHS rule is unlawful because it falls out. Well, outside of public charges, core settled meaning is applying to a person. It's primarily dependent on the state for their subsistence needs. Yes, your honor. So as the second circuit held in its opinion, if you look at the suite of historical interpretations of the term, although they don't use the words, they don't use the words primarily dependent. There's a blue line and how they're performing their analysis and what they're looking for. And they're all looking, although they don't use these words for primary dependence. And you can describe that as a primary reliance or near complete dependence. If you look at the history, that's a consistent that's consistent across the vast majority of cases of that's what they're looking for. So counsel, you think that goes all the way back. If I recall correctly, you cited in you and every everybody except for I think maybe the state of California cited to this 1828 Webster's dictionary definition. Person or thing committed to another's custody, care, or management, the definition of charge. You recall that. What I thought by nurse. And so it turns out that my wife actually we homeschool our kids. So we have that dictionary. So I was sitting at home reading for this case and I thought, well, I'll look and see which I don't normally check. And that particular definition actually has a second sentence that, that nobody cited to, which I'm a little surprised to. They all cited the first sentence, but nobody said, do you remember what the second sentence was there or not? I, you know, off the top of my head, I don't, your honor. So what's interesting about about Webster's dictionary is it's full of little like explanations. This 1828, so I'm a white hat, I guess it's because it's full of these little explanations and give an example of what it means. An example here is dust. It goes on the second sentence right after what you quote. Thus, the people of a parish are called the minister's charge. So it gives that example from, of the people of a parish, a church are the minister's charge. So I don't know how, I thought that was really interesting because, you know, basically like basic Christian doctrine would be that the, the person primarily responsible for somebody's spiritual welfare is not the minister, right? The person primarily responsible for their spiritual welfare is the, is the person themselves. I mean, that seems to be basically Christian doctrine that Daniel Webster, Noah Webster would have been aware of. And so it seems to me that that definition, that explanation of what that meant there, this, this way, the person being committed to another's custody of care or management shows that somebody would be a charge, even if they weren't primarily responsible for that person. In this case, a minister being primarily responsible for their spirit. In other words, they'd be under their care, but not primarily responsible. I'm a little surprised that everybody cited this definition, but nobody cited that second question. That second, that second statement explaining what it means. So I think, so your honor, I'm not, I'm not able to speak to how Christian doctrine understood the term charge, but I think that what it speaks to is, is again, this, this dependence. And I think if you want to set aside the dictionary definition, the state court decisions around the term public charge at the time really clarify exactly what is meant by the term public charge. And even before the terms used in the 1882 act, there are state court decisions, describing a person with a public charge as being a person who was quote, incompetent to maintain themselves. I also think it's telling that in the 1882 act public charges are, are grouped with idiots and lunatics as people who are fundamentally unable to care for themselves. And there's also an understanding evidence, both in the state court language and in the structure of the 1882 act, that a person can still receive some public benefit without being a public charge. So there are state court cases noting that public benefits can actually prevent a person from becoming a public charge. I mean, I read those in your briefs and you're right. There is statements like that. It's not clear to me. It all depends on what people at the time thought it meant to be, to be dependent upon, right. You know how dependent that's a problem. I think even with the definition that you give, but I mean, you're aware, I assume with, with judge Barrett's dissent in the seventh circuit and she does, I thought a good job of showing that she, you know, she provides a lot of other cases that go the other way. And I think ultimately that's why judge would in her even majority decision ended up. I actually haven't made the fourth circuit, the seventh circuit. They all kind of disagreed with, I mean, you've drawn a short straw. You've got the harder argument for your side of all your, all your colleagues, because they, they seem to have like said, it's not even the seventh circuit. They rule and, and, and upheld the preliminary injunction, but they said there hasn't been a consistent understanding of that over time. So as the second circuit noted in its analysis, of course didn't speak to the fourth circuit decision that hadn't issued yet. That's the seventh circuit analysis. The seventh circuit described as historical review is quote, admittedly incomplete. And so it didn't look at this whole sweep of historical analysis and understanding. The second circuit described its own, or do you mean. Thank you. It's described the seventh circuit. Historical analysis is as quoted. And then the seventh circuit said that it's about its own analysis, that it was admittedly incomplete and it critically missed or did not consider opinions from the 1960s and seventies. They clarified and further established this settled meaning of primary dependent. I'll point just to a couple of those. So in Martinez Lopez, the attorney general looked at the suite of historical decisions and noted that the general tenor of those, those case law. Outcomes required. There'd be some specific circumstance that show that the burden of supporting the alien was going to be cast upon the government. And the attorney general further concluded that healthy person in the prime of life could not ordinarily be considered a public charge. Parents following this decision. Also noted that a person could, an immigrant can still receive welfare and not be considered a public charge. And so the seventh circuit didn't address. So the fourth circuit. I did not look at any of the history from before the 1952. I understand. But the problem with that is there is, I don't think anybody thinks including the seventh circuit that there are, there is not some, some support for your argument. The problem is though, if there's other. When this court in the state point out, there's other cases. Then then that just shows that it's, there's not a settled meeting. That's the, that's the challenge. Counsel is, is the approach that you're taking? Essentially the approach that judge Hamilton's book is the district court. To some extent, but I think it looks more like a second circuit's approach in terms of looking at the suite of these case law decisions. And as the second circuit noted there, there may be a few outlier cases, but the vast majority of cases line up behind this definition and evidence through line of looking for primary dependence. And I'll just note that the cases that my colleagues cited don't actually cut against that determination. So Turner, which was one of the cases that he cited there, the breadwinner and the primary income earner was likely to be incapacitated from performing any work. And so again, we have someone who's going to be almost totally dependent on the state for their subsistence needs. And my colleague also noted in matter of B, which the state opinion also identified as they seek change in the way that the term public charges understood, but that's a misinterpretation of that case. That case was fundamentally about the procedural protections that an immigrant was owed before they could be rendered the portable under the deportation ground of the, of the public charge doctrine. There the immigrant was the paradigmatic case of a public charge. She was a person institutionalized to public expense. And the matter of B case has always been read that way up until this guidance. So you see in Hartoonian, it being identified as a procedural requirement before deportation can apply. And also in 1989, INS again identified it as a procedural protection that didn't alter the substantive definition of the term. And I also know that in the early 20th century, there was again, this understanding of the primary dependence as being the meaning of the term public charge. This court in Fengho adopted the second state's decision and how that a public charge was a person who was an occupant of an almshouse. And that's who was entirely dependent on the government for support. And the Supreme court in GDL noted that a person should only be identified or that a person could only be determined to be a public charge on the basis of permanent personal objections. So in the face of this settled meaning of the term, the inquiry for this court at the first step of the Chevron inquiry is whether or not the department of Homeland security has offered a definition that falls outside the settled sphere of meaning of primary dependence. And here it clearly does. So the, the public charge role department of Homeland security public charge role would capture people who received supplemental benefits, even de minimis amounts. SNAP is perhaps the most illustrative example of this. So when Congress enacted SNAP in 1977, it explained that the purpose of the program was to provide people with quote, a more nutritious diet. So not to provide people who were starving with food, but just to augment and allow people to eat slightly healthier. The people at the upper end of SNAP income eligibility threshold received 17 cents per day in benefits. And the average benefit is less than $4 a day under SNAP. My colleague suggested that the rule wouldn't capture de minimis people who receive benefits in de minimis amounts because people, the, the income immigration officers doing public charge assessments would be unable to identify whether someone was supposed to receive a de minimis amount, but it's no answer to the fact that the rule sweeps people receiving 17 cents a day. The argument is you're kind of, you know, I get it. You're, you're making the sort of the extreme example shows that this, but let me, let me ask you about the current, the, the 1999 guidance. I keep calling it. It's not, it's not a rule of guidance. I mean, I think you've probably heard me earlier asking government's council. It seems to me that that rule is pretty loose fit too. It's supposedly based on, on this primary dependence rationale that, that you're talking about, but I mean, would you agree that somebody could be getting food stamps, a lot of food stamps, not a little bit, but let's say a lot of food stamps. And serious public housing, maybe, maybe their public housing for free and Medicaid. So they were getting all three of those things, but no cash benefits. And they would not be deemed primarily. They would not be deemed on the old rule, even though the old rule, it seems to me like they'd be primarily dependent. So, I mean, there's some looseness of fit here, right? The rule that you want to go back to. It's also not a real good fit for the purpose. You're saying it's the purpose. So first I would note that the defendants agree that the 1999 guidance was a permissible construction of the term, but I'd also note that when in our, in, in asking the 1999 guidance, INS consulted with the agencies that actually administer the benefit. And they were told quote that they, they told the INS quote, that by their nature, those benefits are supplemental and cannot alone or in combination, provide sufficient resources to support an individual or family. Yeah, but the government, I mean, I, I, I'm sure they said that, but that's my point is that it seems like that just probably isn't necessarily true in all cases, right? Like if you are getting bootstamps, public housing and Medicaid, it's hard not to say that that person they're getting all of their In case I understand, but I mean, that's your point. As you're saying this current rule in extreme case doesn't necessarily fit. So it seems like it goes both ways. So I don't think so. Your honor. So that's what the agencies that actually administer the benefits thought. They didn't think that they were sufficient to form the primary basis of dependence. We're not, we're not arguing that it could never be permissible to consider receipt of public charge assessment. We're arguing that we're a person nearly received 12 months of those, of any of those benefits or in combination for months over the course of a 36 month period, but that's insufficient to render a person primarily dependent on the government for support. I see that I am out of time. So if the panel doesn't have any more questions from the bench. Okay. Thank you very much. Thank you. I'll pass off to my colleagues. Hello. May it please the court and a rich for California, Oregon, Pennsylvania, Maine, and the district of Columbia. Even if the court were to determine that the rules, new definition of public charge was permissible. Can I ask you? And I'm sorry. So I think, I think your, your colleague. It feels like she just gave away the game a little bit. Cause she just said that she's not saying that you can't take these things into account. She's just saying that 12 months is too short of a time. That's starting to sound. I mean, she didn't say how long would be allowed, but if 18 months is okay. I mean, that, that argument started. All right. At the amount of time. Okay. I can't miss a little bit of what you said. It felt sorry. I think it cut out. It seems like your co-counsel just gave away the game a little bit in the sense that she just said that they're not contesting that you can't take into account that a rule couldn't properly take into account some of these non-cash benefits, but it's the timeframe that they're talking about here. But boy, that sounds like you're really getting into the agency discretion. If, if you say, if the argument is just that the rule could be, could be shorter. I mean, could the rule could, it will be fine as long as it was a longer amount of time. Do you agree with that? Do your clients agree with that? No, your Honor. And I don't think that, and I'm not sure that that's, I think that might be a misinterpretation of what Ms. Sedgwick is saying. One thing that's very important to do is see whether what the agency's conclusions about self-sufficiency are match the evidence in the administrative record. And for instance, to answer your Honor's previous question about whether there could be someone who is completely dependent on these three newly included benefits. There's not evidence in the administrative record of that kind of complete dependence. And because if we look at how the eligibility for programs, for those programs work and what the benefits are that they provide. So what do you mean by that? Supplemental. So counsel, what do you mean by there's not evidence in there? You're saying that, are you saying you don't think it's possible for somebody to be on all three of those types and therefore be dependent? Or you're just saying that. Correct. Someone couldn't survive solely on those three benefits alone. They would not provide. That's not the point. The point is primary dependence, right? Like, I mean, they still would have to get to pay for cable TV. They'd have to get some cash from somewhere, but in order to eat and stay in a house and have medical care, that would all be paid for all of the basic necessities of life. So yeah, you'd have to get gas for your car. You'd have to, you know, so. It seems to me like under that definition, most people would say you are primarily dependent upon the government. That was my point. And your answer was that that's not in the record, but it seems like all of the, I mean, all these comments that were suggested are all based on people's sort of, you call them experts, I guess, but people's conjecture about this could act this way. And that's all I'm doing. I'm just saying you could have that and it'd be primarily dependent. Yeah. Your honor. It's not simply a matter of conjecture. The programs are designed with the exception of Medicaid, which does provide a fairly comprehensive amount of medical care, SNAP and housing are not designed to fully supply someone with their nutritional needs or fully supply someone with their housing needs. For instance, just to be clear, it's your position that if you were on food stamps, the maximum amount you could get on public housing, the maximum amount you could get, whatever that is, and Medicare, that all three of those together, that person still wouldn't be primarily dependent upon the government. Correct. Correct. Because that person would still need some substantial other assistance in order to be realized. Like what you just said is it doesn't actually disprove, like just because you also need to provide for yourself, doesn't mean you're not primarily dependent upon the government. You know what I'm saying? It could be 1%, right? Right. It's a matter of degree, but I would suggest that if we look at the weather, what is in the administrative record matches the agency's conclusions about self-sufficiency, we see that in fact, those benefits are supplemental rather than something that encourages primary deficiency. In fact, it's both the second and the seventh circuit found there's a much more nuanced view of Congress about what these benefits do and don't do with respect to self-sufficiency that is not reflected in the rule. For example, the 2002 Farm Bill, which allowed non-citizen children to get SNAP without a waiting period or the 2010 Landmark Affordable Care Act, which greatly expanded access to Medicaid for working adults. These show that Congress didn't think of these programs as programs that, which people are primarily dependent or lacking self-sufficiency, but rather ways to increase nutritional access, increase health care. As the seventh circuit noted, one in four US citizens in any given year will receive one of the four, the three newly included benefits. They're simply not the modern day equivalent of an almshouse the way the motions. Let me ask you about that. So that caused, you know, in your briefing and so it seems to me like, and I think the district courts also kind of relied on this rationale, which is what first triggered me thinking about this. So the district courts basically seem, especially towards the end of their opinions to say, you know, it's, it's modern day. We're getting a lot more, there's a lot more social programs. Okay. That makes sense to me. But then the implication that district courts seem to draw from that was, well, and these are really important social programs and, and lots of people are getting them 40% or whatever. And so therefore we can't be taking those into account, but that's it. Couldn't you just, couldn't you have the opposite implication? I mean, you couldn't theory say, you know, back when we didn't have as many social programs, it made more sense to only take into account certain things. But as we get more and more social programs, we may need to change the rule to actually take those things into account since they are going to be more ways that we are going to have people being supported by the public or by the government. So it seems to me it actually cuts the other way. I don't think that is true, your honor. When you look at what those programs are designed to do by Congress, they're not designed to replace a person's ability to work and provide for themselves. They're designed to be supplemental, you know, expansion of Medicaid, for instance, primarily has helped working adults who might, whose employers don't provide health insurance coverage to access that Sure. Let me share. And I apologize because I'm really curious about it. Cause you're making the, you're the arbitrary and capricious person, right? Like that's the, okay. So it sounds like your arbitrary and capricious argument is tied pretty tightly to the primary dependence argument. And you see what I'm saying? Because you're saying this is arbitrary and capricious because it isn't actually furthering the goal of making sure people aren't primarily dependent. But you know, if we thought like the majority in the seventh circuit that they, that primary dependence wasn't, wasn't the clear statutory meaning, because it's to me, then, then does that mean your arbitrary and capricious argument fails because it's tied to the primary dependence argument? Not at all. I agree that there's a close connection between the Chevron step two and, and arbitrary and capricious when it comes to self-sufficiency. But if I could talk a little bit about the impacts on public health and the local governments, those are ways in which the rule was arbitrary and capricious that are completely independent of this question about how one interprets self-sufficiency. The record actually shows that the rule will have significant and predictable negative consequences on public health. And the agency's quote unquote belief that it's going to somehow have a long-term positive effect on public health simply isn't supported by the administrative record. Every major public health professional organization to comment on this rule in the public record offered evidence-based explanations of how the rule would, for example, significantly increase the rate of outbreaks of communicable diseases. I'm sorry, I didn't hear it. It would increase something. I missed what you said. Increase the rate of communicable disease outbreaks. So, you know, they didn't know about COVID when they were commenting, but they were talking about things like tuberculosis and measles. The fact that my colleague, Mr. Simstack said that, well, the agency made some changes between the proposed rule and the final rule to try to deal with those. Is the final rule reasonable or rational if it was indeed, as the evidence in the record shows something. So do you agree that those are, I mean, I, I was following in the briefing sort of the back and forth on this. It seems like you guys are really pooh-poohing the changes that the agency made, but if you were to, and I get, and I think the agency acknowledged that there's still some people that would not be eligible for vaccination because people over 21 and such need, but the changes the agency made seem pretty significant that, that in response to the comments saying, well, okay, we're going to make it so children can be on Medicaid and can get vaccinations. I mean, that's, that's when I think, maybe it's because I raised three kids, but when I think of vaccinations, I mostly think of kids. Well, you know, your honor, when, when the rule is compared to the evidence that's in the administrative record, those exceptions become a lot less powerful and a lot less convincing. For instance, public health experts say that having Medicaid in the first place in the first instance, including for adults is a really important way to connect patients with vaccines. So the fact that the rule has an exemption for federally funded vaccines, but still will negatively weight receipt of Medicaid is going to discourage people from being even being in a position where they could get access to vaccines. Similarly, the effects of the rule on. So council, but, but I think we all, if we, if we're all understanding how the rule works, if you're a, if you're not a lawful permanent resident yet, so you, and you're here for your first five years, but you're not eligible for Medicaid anyway. Right? So like it seems to me, Congress has already made the decision that isn't even being challenged here that those folks shouldn't be eligible for Medicaid. And you're, you're experts. All your we're all commenting that the sky is going to fall as people are. But I mean, Congress has already done that and for many of these people, Right. Which, you know, on some level raises the question of why, because many of the people who are going to disenroll as a result of this rule, Even the defendants would agree there can be hundreds of thousands of people who disenroll as a result of this rule from benefits who are not actually subject to the public charge determination, but we know that that is the predictable negative effect of this rule. And that's part of why the agency failed to accurately calculate the costs on stakeholders, state and local benefits. There's substantial evidence in the record that there are groups of people who were just simply not counted by the agency when they estimated their disenrollment effects, for instance, who are certainly going to decide to withhold to avoid Medicaid, for instance, out of fear and confusion because they don't fully understand immigration law. Those kinds of predictable real world consequences are the sort that the agency needed to, to take into account when it was coming to its conclusions. And they have a material effect on the consequences of the rule, both the public health impacts and the, the negative cost to state and local governments, because of course, responding to an infectious disease outbreak, as we know, is in and of itself expensive. And the fact that the agency decided just not to even try to calculate any, even with a range, we agreed that there wouldn't have been a way to come up with a precise number, but there's quite a bit of evidence in the record. For instance, I'd point the court to the center on budget and policy priorities comment letter, which has described the different costs benefit analysis that results from any decrease in the vaccination rate. It would have been possible to calculate a range of likely costs of the rule. And instead the agency simply said, you know, this is our interpretation of the purpose of the statute at all costs. Essentially. There's no real, even though it's a very long rule, there's no real attempt to make the findings in it. I don't know that. I mean, you were talking about vaccination. They did make some changes, so I don't know if it's fair to say that they would pursue it. Right. Yeah. Well, they didn't make any effort to evaluate whether those changes were going to be effective. And this point that I made about how important Medicaid is and having a primary care doctor who can, that, that is what public health experts say makes a difference to whether someone gets vaccinated or not, not whether the vaccine itself is subsidized by the federal government, but whether people have that kind of trusting relationship to a primary care doctor that makes a huge difference. And it's access to Medicaid that will ensure that that happens. I see my time is almost up. And so just say that there are many, this is a case where the court really needs to compare what is in the administrative record to the rule itself. And if it does, so we'll find that it was arbitrary and capricious. Thank you. Can I, can I ask one question? What, what is I, maybe I should have asked your co-counsel, but what, what did, in your view, what is the significance of the Supreme court say seventh and second sentence? It's hard to know what the significance is. It just means that the, the, the Supreme court decided that it was on all else when it applied the state factors, that it was better to keep the injunctions in abeyance, but there's no additional guidance that I think that we get from the Supreme court. They certainly didn't have access. That was on very limited briefing and a very quick turnaround. As with the motions panel, they didn't have time to consider many of these more detailed questions. And they'll probably get it in the law and then they may wind up with it in the long run. Can I, can I ask a question, a follow up question on that? And that is, we referenced several times at the motions panel on limited brief, what were the briefs like in front of the motions panel? I guess I could go, I could have went and pulled them up, but I didn't. I kind of was assuming that they were fairly similar to the briefs that we have now, which are fairly similar to the district court opinion. So that's why they were much, much, much shorter. So there was a much less room to describe, especially on a claim like the arbitrary and capricious claim. It wasn't as much time to explain what went on the motions panel then. And also the motions panel decision doesn't, it only refers to the rule in and of itself. It doesn't do that active comparing what's in their rule to what's in the administrative record. And those are the kinds of issues that are before this panel now. But by rule, briefs to the motions panel are much shorter than conventional briefs to the argument panel. Now the motions panel has the capacity to ask for longer briefs, the ordinary rule, asking some special order from the motions panel is that the briefs are much shorter. Correct. And there was no additional briefing. They were just the normal motions panel length. And it was a very quick turnaround right over the Thanksgiving weekend, last weekend. It was before any of the other circuits that rule. Correct. Okay. Any further questions from the bench from Ms. Rich? Okay. Thank you very much. Thank you. Good morning. Tara Heinz, deputy solicitor general for the state of Washington, arguing on behalf of the coalition of states in the Washington case. Yes, Your Honor. I'll be addressing the issues of standing and irreparable harm, the balance of the equities and the nationwide injunction. Starting first with standing and irreparable harm. Both are established here, largely based on DHS's own estimates and admission. DHS itself anticipates that hundreds of thousands of immigrants and their family members will disenroll from public benefits due to fear of consequences of the final rule. And the evidence in this record, including sworn testimony declarations by public health officials, show that that number is actually vastly underestimated. That there was a much higher rate of disenrollment in the 90s after passage of Perora. That immigrants disenrolled from benefits at rates of 21 to 54%, depending on the public benefits at issue. And that refugees disenrolled at rates as high as 60%, even though they remained eligible for the public benefits that were at issue there. The evidence in this case shows that the real disenrollment rate is likely to be millions higher than anticipated by DHS. But even with DHS's own low estimates, DHS anticipates that states will lose $1.5 billion worth of federal transfer payments. And again, that's on a low range of estimates provided by OMB that go up to $4.4 billion. Every court that has considered the issue. Can I ask you about that? Cause I, and that's a big number. Two things that occurred to me about that number. One is that there's a certain amount of money that the states have to kick in sort of to, to, to go along with that money. And presumably that money would be saved. Do you have any idea how much that is? And then how much of the money is just past your money? So saying the states are going to lose this money that we would have given the people. I'm having a little trouble knowing like how that's an injury to the state since you won't be giving it to people. So losing the money. So on balance, do you know if there are any numbers in Iraq? I didn't see any, but on balance, do you know what the state is going to and in theory, the state could be saving more money in its own payments than it, than it's losing in federal payments. I guess that's the question I've got is what are those numbers, right?  Your honor. At first, the district court in California found that the idea that the states would save any money in uncredible. They did. It did not give any weight to this assertion because it would require administrative changes that were, it was implausible that the states would be able to make in time in order to capture any savings. But under DHS, his own estimates, which the district court found to be implausible, the costs will outweigh the cost savings by hundreds of millions of dollars. And that is why every single court to have considered this argument by the government has rejected it and held that the states have established article three standing here. And the second and the seventh circuits have both held that the loss of federal payments, which will outweigh any potential cost savings are also sufficient to establish irreparable harm because the states do not have a money damages claim against the federal government. And this doesn't even consider all of the other harms that state, that DHS acknowledges that the state will likely suffer, but which it did not attempt to quantify. And my colleague touched upon the public health harms. This is a particularly significant issue that DHS itself acknowledges that the final rule will result likely result in decreased vaccination rates and even small decreases in vaccination rates can harm the ability to transmitting. This is particularly relevant right now, as we are working towards the development of a Corona virus vaccine, but it also this, this decreased vaccination rates also increases the risk of localized outbreaks. Like measles months for Bella and pertussis and hepatitis. And the cost of mitigating and treating these localized outbreaks will fall onto states who serve as the insurer of last resort for many low income individuals. And the costs will be significant that the measles vaccine costs $110 to administer, but it costs up to $143,000 to treat someone who has been infected with the virus. LA County estimates that every single time someone infected with measles walked briefly through the LA airport, the county incurs an average cost of $27,000 to trace and mitigate the spread of measles. The harm to states will also be compounded by the increasing use of emergency rooms and emergent care as a form of primary healthcare. And this is also a likely result that DHS concedes it will occur. Each newly uninsured individual is associated with an average increase of $900 of uncompensated care costs. And these costs are likely to befall state public hospitals the most. The public hospitals tend to serve these low income communities. Hospitals that are funded by the state and by counties serve low income communities, and they rely disproportionately on federal Medicaid funding for their funding. The states will also be burdened by their residents loss of federal food and beverage benefits. The benefits for SNAP, for example, have been studied for decades. It helps kids do better in school. It increases graduation rates by up to 18% in girls. It helps people maintain employment. It provides access to fresher and healthier foods. It improves health outcomes. It lowers infant mortality. It decreases the risk of obesity, and it lowers the instances of severe psychological distress. The benefits are so positive in childhood that the receipt of SNAP benefits increases the likelihood of adult independence. But SNAP is also a gateway for other types of benefits that are not covered by the public charge rule, but in which individuals are automatically enrolled by virtue of their enrollment in SNAP. So, for example, states often automatically enroll SNAP recipients into free school lunch programs and into WIC. And so disenrollment from SNAP will automatically disenroll these individuals from these other programs that are not even covered by the public charge rule. Well, Counselor, how does that affect you? You probably heard the call I had with your California colleague about, you know, when you start adding all of these together, all of these non-cash benefits, and I think her position was, even if you add them all together, you still could never be primarily dependent. But now you're saying, on top of these other benefits, there's supplemental benefits that you get. I mean, don't you at some point get to where you're primarily dependent, even if you're not getting any cash? Or is that your position too, that you just can't be primarily dependent? Your Honor, the point is, is that the public charge definition is now defined by receipt of these benefits, regardless of the amount. So if you're getting 17 cents a day on average of SNAP benefits for a public charge, whether you receive 17 cents or whether you receive. But I think your argument was, if you're getting 17 cents of SNAP benefits, you're actually getting a lot more, I think. That's not right. I'm talking collectively about the benefits for the people who, who obtain SNAP benefits. But on the average, people don't actually receive that much. They receive on average of $4 per day. But that receipt of that benefit still can have a powerful impact in people's lives. And the deprivation of that benefit can have a negative consequence, even if it's not sufficient. You know if the person is getting that average, what you're calling small benefit, is also on top of that getting WIC and preschool lunches and those other benefits or not? I don't know whether it's tied to the average receipt of benefits. Certainly some people do. It seems like when you start adding all those things on top and all of a sudden now maybe it's not so small, right? If you get a lot of other supplemental benefits on top of a small SNAP benefit, then maybe you actually are getting a significant benefit from it. And I think the problem here is that the public charge definition here is not defined as people who are receiving a huge amount of benefits. It's defined as anyone. It's a misunderstanding. My point was you have the same problem but in the inverse for the 1999 guidance. If you're saying that it's primarily dependence but you can't be primarily dependent somehow even though you're getting all these benefits and then you're also getting the supplemental benefits you're mentioning, it seems to me at some point you're getting primarily dependent, even under that rationale. I understand your honors argument. I think the whole point of it is that this definition is so broad. It incorporates so many people who are not primarily dependent on these benefits. The public charge definition is now redefined as receiving these benefits in the aggregate for the specified length of time. If you receive them, regardless of whether it's 17 cents, you are now by definition a public charge. And so the whole point of it is that when you get that overbroad and you're not primarily dependent on it, then that's when you've gotten outside the bounds of the meaning of that term and that's when you're in the arbitrary and capricious realm, which I won't stray too far into that analysis. But the point here is that even when the benefits are small, that access to fresher and healthier foods is very significant. And the SNAP benefits are also an economic multiplier. So for every dollar of benefit that is spent, it results in $1.79 of economic activity. And DHS itself anticipates that there will be $550 million worth of lost economic activity due to the disenrollment that they predict, which, again, the evidence in this case shows is a very low estimate. States will also bear the brunt of mitigating the loss of housing benefits. And, again, these housing benefits are particularly important to working families. The evidence in this case shows the sworn declaration that a lot of working families rely on this when they live in high-cost areas. And so the removal of these benefits will increase housing instability as these working families have to move from their chosen neighborhoods, from their chosen public school districts, and that those people at the margins may become homeless. And this burden will fall hard on states. DHS also anticipates that the rule will worsen health outcomes, including, and this is DHS's own word, it will increase the prevalence of obesity and malnutrition, especially for pregnant or breastfeeding women, infants, or children. It will reduce prescription adherence. The evidence in this case, including sworn testimony, shows that people are going to skip their cancer screenings. They are going to miss out on preventative care. They are going to, they're not going to get treatment for basic chronic illnesses like hepatitis and diabetes and cancer. The consequences will be severe. This is a literal parade of horribles that you're providing for us. It sounds like what you're saying is there are a ton of people that are super dependent upon the government. And so, you know, this rule is going to make it so a ton of people aren't going to be able to be that dependent on the government. It seems to me that's some support for the government's position for having this rule, given that the rule says that you shouldn't be a public charge. And of course, that turns on whether primarily dependent or self-sufficiency, but let's assume for a second that self-sufficiency is a legitimate means for the government. How does not all this stuff that you just said, I understand it's probably support standing, but how does it not also support the idea that you've got a lot of people? It sounds like that. Wow. They're very not self-sufficient. They're relying on the government for all this stuff. Because your honor, these are benefits that people can and do without. And so there are many, many millions of people in America who do not have access to healthcare. But if you take people off of healthcare, there are going to be negative consequences to that, including consequences to the public health. This is the reason why the 1999 field guidance was put into place in the first instance. That after the passage of ARERA, the government saw and DHS's predecessor agency saw that there was going to be this impact to public health. You're going to have increased communicable diseases. You're going to have people who don't have access to fresher and healthier foods. You're going to have increased instances of diabetes. These are not things that go to the issue of primary dependence, but they do show that there are going to be negative health outcomes. Do they go to self-sufficiency? That's I guess the question. Do they go to self-sufficiency? They do not, your honor, because certainly for people at the margins, there may be people at the margins that are affected, but for the most people, for the average person who receives SNAP benefits, they can do without the $4 a day of additional benefits, but there will be consequences in doing that. And that is the reason why DHS instituted the field guidance in the first instance, particularly the public health harms when we're in the midst of the coronavirus pandemic right now. And while that fact was not before the district court, the risk of the harms that would befall this country was before the court. And so everything we're just seeing now play out in sharp relief, the risk of harms that the states warned of, that when you have even small decreases in vaccination rates, which that relationship that is created by Medicaid, it's very important to keep the vaccination rate up. When you see a, even a small decrease in the vaccination rate, then you can, you will see a decrease in the ability to develop herd immunity. I want to turn quickly to the nationwide. You're now over time. So if you would sum up. Okay. Your honor, the harms of the rule are enormous and largely conceded the district court has ordered and the nationwide injunction should be affirmed. Okay. Any further questions from the bench? Thank you. Thank you very much. All right. One last change. Mr. Adam. Yes. Yes. Pleasure. I may please the court. Then we'll have them in on behalf of the U.S. House of Representatives. And before I begin, I just like to thank the court. I would appreciate it. Sure. I'd like to thank the court for granting the house argument time in this important case. I don't want to recapitulate the arguments that my colleagues have made, and I don't want to take up too much more of the course time. I would like to emphasize just a few points that came up during Mr. Since that argument, the first is that the evidence is, I think quite strong, but the term public charge has always meant someone who is primarily dependent on the government for support. And the court can look to not just the dictionary definitions that were in place at the time, but to the language that Congress used when it first enacted statute. I assume you were listening. You, you, your brief two sided that everybody liked that 1828 definition. But I think you heard me say earlier that that 1828 definition, all of you left off, including your brief left off the second line in that definition, which seems to me to be very revealing as to what it means. When the definition talks about somebody being under the care of somebody that they don't need to be primarily under the care. So why did you do that? Why'd you leave the second part of the definition up? I think it was not obvious to us how the term charge. Is it because you don't understand like the religious, like I could try to figure out, it seems obvious, but maybe you have to understand like religious doctrine or something. I don't know. Again, it's not clear how it's application in the religious context would carry over. So the context of economic support, Again, the sentence says you have to be under the care and something else or the, the, of somebody. And then it goes on to say that in somebody would be the minister's charge. But I mean, the minister's charge, obviously the minister is not primarily responsible for that person's care. So I don't. The definition is the question is not in charge means the question is what public charge means. I find this line of argument quite irrelevant. Right. How they all made it. I guess that's my point. If they all, they all relied on except for the state of God and to judge Fletcher's point. I think, I think judge judge Barrett and the seventh circuit agreed. I'm not sure if I agree with her. She didn't think that the word charge or the word public alone, she thought it was the word public charge, like a, or like almost like a term of art or something. But the point is, is you guys all made that argument. So I just kind of figure out why you made it, but kind of left off. The argument is that it's very clear and it's been clear since, since the beginning of our country, essentially, but it seems like the very first document you cite for that undercuts your argument. Well, I don't think it does undercut the argument, but why don't we look to the text of the statute itself? So the text of the statute itself in 1882 referred to a person who is unable to take care of himself or herself without becoming public charge. So already in 1882, Congress is linking the concept of being a public charge,  statute. With the concept of being able to take care of one's self. And we think that that is not going to be looked to the original meaning of the term when Congress first enacted it. But if there were any doubts about the scope of the term, the doubt was dispelled over the course of more than a century of precedent. So, but again, I think you're, you're actually making the same mistake that, that is made in that when you rely on that night, 1882 document, whether or not somebody can take care of themselves, you have different degrees of a person's ability to take care. And the whole, the whole question becomes that the questions being bagged in all of this is how much not being able to take care of yourself counts as being somebody else's charge. And it seems like that definition is saying that the people in the parish or the minister's charge means that if the minister is doing some amount, then, and so that's the problem. I don't see any of your definitions, any of them in your definitions, any of your cases, like addressing that particular issue is how much, I mean, the whole thing is the degree of care that you need to be getting. If it's only 5% and you're a charge of somebody, even if you're getting 5% of your care, then obviously that's less, less than primarily dependent. And none of these, none of these make clear one way or the other, except for possibly that one sentence about being the minister's charge. So I, I don't think that it would be fair to say that someone who receives, you know, 5% or a small percentage of benefits would be unable to take care of themselves without it. But even if your honor disagrees with me, even if your honor thinks that there's some ambiguity in that phrase, look to the way that courts have interpreted it since. This court in the Ho versus White case said that this refers to people who would be occupants of all houses. The second circuit, an opinion by Judge Learnedham said that it referred to people who would be destitute. But there's also cases counsel, there's also cases that say that, you know, remember there was a whole period of time when D or not DHS, but the government position was if you got benefits, but didn't pay them back. And you've got to, you know, you had the, you had the three-step thing. You had to get a bill from the government and you didn't pay the bill. Then you're a quote, unquote public charge, but that didn't turn on the amount of benefits you got. Right. So that seems to, that seems to undercut. So there's cases going both ways. You're, you're cherry picking the cases that, that support your, your position, but that's a. Sorry, I don't want to interrupt, but respectfully, I just disagree with that characterization. That's what judge Wood thought. Judge Wood thought that in the seventh circuit. I agree. And we respectfully think that judge Wood was mistaken. And this is, I think the salient point. There is no case that DHS has identified. None over the course of 138 years of this term being interpreted by the courts, by the BIA and by the attorney general, no case in which someone who received small amounts of benefits over the short term was deemed a public charge. And let me ask you, I'm sorry, judge Fletcher, can I ask about this? I think he's wrong about that. You know, he keeps going as long as. Let's go to your, let's go to your expertise, which is Congress. Congress went in 1996. I think it was actually said that somebody is a public charge. If they can't get an affidavit and the affidavit that you know, the argument about the affidavit. And I know everybody on your side of the case is sort of downplay the affidavit requirement, but it's true that if you, if you, the affidavit was, if I have any charges, including the affidavit in just color, cover cash benefits, it covered non-cash benefits to certain types of them. And if you got charges for that and you didn't pay them back, you were a public charge. More to the point, if you couldn't get an affidavit saying that you would be able to have somebody pay those back, essentially bond you. And Congress, Congress implemented that. And they tied that specifically to public charge. So how does that not support this concept that to be a public charge, you have to be primary. There's nothing about primary dependence in that. I mean, a small amount of benefits that you get. If you don't have this affidavit, then you still wouldn't be, you still would be a public charge under that definition. So I actually think that the affidavit provision supports our understanding of the meaning of the term public charge. And here is why Congress is a prophylactic matter in 1996 required non-citizens or certain non-citizens who were applying to become LPRs. To obtain an affidavit of support. And the sponsor was required to agree to provide, to maintain the income of the non-citizen and to pay the government back for any benefits that the non-citizen ultimately received. Including non-cash funds. Yes, that's right. So as a prophylactic matter, that's what Congress said. And Congress said, if you can't get that support, if you can't get the sponsor, then we don't have confidence that you will be able to support yourself over the long term. But that is consistent. And you'd be a public charge. They tied that and said you will be considered a public charge and therefore won't. Right. But that reflects that Congress did not think that a person who came here, who at some point in their lives needed to obtain or obtained benefits, and had a sponsor who was able to reimburse those benefits. Congress did not think that that person was a public charge. Of course not. Of course not. Because that person is not actually costing the public anything. They may be temporarily getting essentially a loan from the public, but then there are sponsors paying for it. They're a sponsor's charge in that instance. And recall that the DHS rule does not define public charge by virtue of unreimbursed benefits. DHS says that if an immigration official believes that at any point in your stay here, you receive benefits regardless of whether or not you have a sponsor who can repay those benefits, and remember that everyone who is applying to be an LPR needs a sponsor at the outset, the DHS rule says regardless of their ability to reimburse the government, that that person is a public charge. And that's not consistent with the actual provisions that Congress enacted. And just stepping back, I know that I'm running out of time, and I don't want to take up too much more of the court's time. Recall that DHS is making a chef-on argument. That is, they are saying that Congress intended to give them discretion to change the meaning of the term as they have changed it. And I want to emphasize that this rule is absolutely transformative. And I think that DHS agrees with that. I think that DHS agrees that this rule just transforms the landscape. And the numbers are sketchy, but we do know that about 3% of noncitizens received the type of benefits that were relevant to the public charge analysis under the old system, about 3%. And we also know that about half, half of the people born in this country at some point in their lives will obtain one of the benefits that DHS now says is enough to make you a public charge. And it is, I think, fair to say that it is inconceivable that Congress, when it reenacted this provision that had appeared in the law for 138 years, when it declined to change the definition to mean something similar to what DHS now says it means, it is inconceivable that what Congress intended to do was to allow DHS to implement, for the first time in the history of this country, what is tantamount to a wealth requirement for immigrants wishing to settle here. It is not consistent with Congress's intent, and I'm happy to answer any other questions that the Court has. Otherwise, I urge the Court to affirm. Okay, you're over time. Any further questions from the bench for Mr. Hedlund? Okay, thank you very much. Thank you. Mr. Sinzak, you've saved a little time for rebuttal. Thank you, Your Honor. I'll try to be brief. I know we've been going for a while. I just have two points to make. One is just on the history of what the term has meant. I won't belabor the point. We cite dictionary definitions and cases in our brief. Horn, Fishman, and Ansar, where they stated a much broader definition than the primary defendant. They stated the definition of just a charge upon or a liability or tax upon the public is sufficient. And there's also quite a lengthy history discussed in Judge Barrett's dissent in the Fourth Circuit as well. So I would point the Court there for evidence that this is not a term that has a fixed meaning. I'd also point out that there would have been no reason or basis for the guidance in 1999 if everyone understood all along that there had been this fixed definition. In fact, I think the guidance makes it clear that the agency understood that it was an ambiguous term, not defined in law, that had been given varied meanings, and that there was confusion. So they clarified it by giving one reasonable definition, but no one was of the view that this was settled, and we know that from Congress itself. I think the only other point I would make is just to talk again about this enrollment impact. And the agency did take action to account for the public health effects, and I would just emphasize that this enrollment, as I think plaintiffs can see, is by people who are not subject to the rule. Because if they're eligible for Medicaid, they're not subject to the public charge rule. You'd only be eligible if you'd been here for a number of years. And while the agency took action to account for that, also I don't know that it could be considered arbitrary and capricious to abandon the rule just because there are people who aren't subject to the rule who are confused and think that they are. So I understand that there's like two groups, it seems like, right? There's the group that they're saying is people that aren't subject to the rule, but are prophylactically more scared, so they're withdrawing. And then there's the 180-day folks, right? Like if you think you're going to leave the country, you're a lawful permanent resident, and you think you're going to leave the country for 180 days, like, oh, no, I better not get on any of these benefits because that could affect me. That's it, right, pretty much? So that's it. Now, I would say with the 180-day people, you are actually, if you do leave, you're abandoning your green card or you're considered to have abandoned your green card and can lose it. So there are high stakes in doing that. And so I think that group is quite small. But, yeah, those are the two groups. I think the larger group, the overwhelmingly larger group, is the group of people who aren't subject to the rule but are confused or doing it out of an abundance of caution. And as the agency noted, it's not, you know, they're doing so in an unwarranted fashion because they would never be subject to the rule. I think that's the only other point I would make, which, again, I'm sure you guys are familiar with it. With respect to the Second Circuit's decision, it did also ignore the affidavit of support provision and some of the other INA provisions largely ignored those. And I think Judge Van Dyke was asking that that affidavit of support provision in particular is hard to reconcile with the notion that primary dependence is what Congress had in mind since, you know, if you don't get an affidavit of support, you're considered a public charge even if you, you know, have no expectation of using benefits in the future or using only a minimal amount. If your honors have no further questions. Any further questions from the judge? Thank you very much. I thank all counsel for very good arguments in this case. I compliment all of you. And the case is now submitted for decision. Our apologies for the technical difficulty. Yes, the technical difficulty is not your fault, right? Okay, thank you very much.
judges: Schroeder, W. Fletcher, Vandyke